UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF NEW YORK

_____x

AARON TELLER
Guatemala

       Petitioner,

v.

      SARA FEIGA HELBRANS
Guatemala

      Respondent

_____x

File No.:

VERIFIED PETITION FOR THE EXPEDITED RETURN OF THE CHILDREN TO
PETITIONER AND FOR IMMEDIATE ISSUANCE OF ORDER TO SHOW
CAUSE TO RESPONDENT

**The Convention on the Civil Aspects of International Child Abduction, done at The Hague on October 25, 1980; International Child Abduction Remedies Act, 42 U.S.C. §§ 11601 et seq.**

**Preamble**

1.  This petition is brought pursuant to The Convention on the Civil Aspects of International Child Abduction, done at the Hague on October 25, 1980[1] (hereinafter the "Convention"), a copy of which is attached hereto as <u>Exhibit A</u>, and the International Child Abduction Remedies Act[2] (hereinafter "ICARA"), a copy of which is attached hereto as <u>Exhibit B</u>.

2.  ICARA is the federal law establishing procedures to implement Hague Convention protections against international parental child abduction.

---

[1] T.I.A.S. No. 11,670, at 1, 22514 U.N.T.S. at 98, reprinted in 51 Fed. Reg. 10493 (1986).

[2] 42 U.S.C. 11601 <u>et seq.</u> (1995). Indeed, ICARA was created to deal with the sudden abduction of children and to allow a petitioner to assert his or her rights in exigent circumstances.

3.  An action under the Hague Convention is commenced by filing a Petition in the jurisdiction where the child is located.  22 U.S.C. § 9003(b).

4.  Mr. Teller requests that this case be adjudicated on an expedited basis because of the urgent psychological condition of the six children taken from him by the mother in Guatemala starting on November 5, 2018 and because of the need to repair the shocking violations of his custody rights under the Hague Convention.[3]

5.  The Convention came into effect in the United States of America on July 1, 1988.

6.  The objects of the Hague Convention are as follows:

    a.  **to secure the immediate return of children wrongfully removed** or retained in any Contracting State; and

    b.  **to ensure that rights of child custody and of access under the law** of one Contracting State are effectively respected in other Contracting States. Convention, Art. 1.

7.  The Convention applies to cases where children under the age of sixteen (16) have been removed from their habitual residence[4] in breach of the rights of custody of the petitioner, which the petitioner had been exercising at the time of the wrongful removal[5] or wrongful retention[6] of the child.

---

[3]  The Hague Convention contemplates a decision to repatriate the children within 6 (six) weeks after the filing of the petition.

[4]  "Habitual residence" is not defined by a specified period of time. It is the place where the child has been physically present for an amount of time sufficient for acclimatization and which has a degree of settled purpose from the child's perspective. Feder v. Evans-Feder, 63 F.3d 217, 224 (3d Cir. 1995); Morris at 1161 ("the law requires [the Court] to focus on the child in determining habitual residence"); see also In re Robinson, 938 F. Supp. 1339, 1341-42 (D. Colo. 1997). It is a state of being or state of mind. Habitual residence is the permanent physical residence of the children as distinguished from their legal residence or domicile. In Re Bates, No. CA 122-89, High Court of Justice, Family Div., England, February 23, 1989; Brook v. Willis, 907 F. Supp. 57, 61 (S.D.N.Y. 1995); Loos, 651 A.2d at 1080 (stating that it is immaterial that the concept of habitual residence lacks precision).

[5]  "'The removal of a child from the country of his or her habitual residence is 'wrongful' under the Hague Convention if a person in that country is, or would otherwise be, exercising custody rights to the child under that country's law *at the moment of removal*." Friedrich v. Friedrich, 78 F.3d 1060, 1064 (6th Cir. 1996, italics added); see Prevot v. Prevot, 59 F.3d 556 (6th Cir. 1995); Convention, art. 3.

[6]  "Wrongful retention" occurs when it is in breach of rights of custody attributed to a person under the law of the country in which the child was habitually resident immediately before the retention; and at the time of retention these

8.  The Convention's remedy to repatriate the child to the home country is designed to "preserve the status quo" in the child's country of habitual residence and "deter parents from crossing international boundaries in search of a more sympathetic court." Blondin v. Dubois (Blondin II), 189 F.3d 240, 246 (2d Cir. 20 1999) (quotation marks omitted).

9.  As has been stated by other courts addressing Hague cases, the Convention therefore authorizes a federal district court *to determine the merits of the abduction claim but does not allow it to decide the merits of any underlying custody dispute.* See Morris v. Morris, 55 F. Supp. 2d 1156, 1160 (D. Colo. 1999) (recognizing that "[p]ursuant to Article 19 of the Convention, [this Court has] no power to pass on the merits of custody"); see also Currier v. Currier, 845 F. Supp. 916 (D. NH. 1994) citing Friedrich v. Friedrich, 983 F.2d 1396, 1399 (6th Cir. 1993); Meredith v. Meredith, 759 F. Supp. 1432, 1434 (D. Ariz. 1991).

10. The court's role is not to make traditional custody decisions but to determine in what *jurisdiction* the children should be physically located so that the proper jurisdiction can make those custody decisions. Loos v. Manuel, 651 A.2d 1077 (N.J. Super. Ct. Ch. Div. 1994).

11. In Souratgar, a Hague child abduction case, the Second Circuit notes the need for comity, as "the careful and thorough fulfillment of our treaty obligations stands not only to protect children abducted to the United States, but also to protect American children abducted to other nations-whose courts, under the legal regime created by this treaty, are expected to offer reciprocal protection." Souratgar v. Fair, 720 F.3d 96 (2nd Cir. 2013) citing Blondin II, 189 F.3d at 242. In the exercise of comity, 'we are required to place our trust in the court of the home country to

---

rights were actually exercised, or would have been so exercised, but for the wrongful retention. Convention, art. 3; Feder, 63 F.3d at 225; Wanninger v. Wanninger, 850 F. Supp. 78, 80-81 (D. Mass. 1994).

issue whatever orders may be necessary to safeguard children who come before it.' Id. at 248-49; cf. Carrascosa v. McGuire, 520 F.39, 261-63 (3d Cir. 2008), " Souratgar at 24.

12.  For the non-absconding parent to make his case in chief, he must prove his case by *a preponderance of the evidence*. See 22 U.S.C. § 9003(e)(1)(A) (1988).

13. The petitioner must prove that he had custody rights and that he was actually exercising them at the time of the unlawful removal. See, e.g.  Baxter v. Baxter, 423 F.3d 363, 369 (3d Cir. 2005); Mozes v. Mozes 239 F.3d 1067, 1084–85 (9th Cir. 2001).

14. Finally, the petitioner must establish the children were taken from the country where they "habitually resided."

15. The analysis of "Habitual Residence" is fact-intensive.[7]   Courts have considered various factor to determine "habitual residence" such as the language spoken by the child,[8]  how well the child has acclimated to the country; the parent's intentions when they intended to settle down; how long the child resided in the particular place,[9]  the medical history and medical resources available to the child; the schooling of the child,[10]  the child's social life[11]  and community, and finally the age of the children.[12]   This analyses of "habitual residence" is cited in *"The 1980 Hague Convention on the Civil Aspects of International Child Abduction A Guide for Judges, 2nd Ed., Hon. James D. Garbling, Federal Judicial Center, 2015.*

---

[7] See, e.g., Holder v. Holder (Holder II), 392 F.3d 1009, 1016 (9th Cir. 2004) (opining that cases involving military families do not "generate a typical fact pattern and, in all Convention cases, emphasis is on the details of the case at hand").

[8] See, e.g., McClary v. McClary, No. 3:07-cv-0845, 2007 WL 3023563 (M.D.Tenn. 2007) (unreported disposition).

[9] 199. See, e.g., Miller v. Miller, 240 F.3d 392, 400 (4th Cir. 2001); Feder v. Evans-Feder, 63 F.3d 217, 224 (3d Cir. 1995).

[10] 200. See, e.g., Ruiz v. Tenorio, 392 F.3d 1247, 1255 (11th Cir. 2004); Silverman v. Silverman (Silverman II), 338 F.3d 886, 898–99 (8th Cir. 2003).

[11] 201. See, e.g., Holder II, 392 F.3d at 1020.

[12] 202. See, e.g., id. at 1019.

16. Once the petitioner establishes by a preponderance of the evidence that the child was taken "wrongfully", see 22 U.S.C. §9003(e)(1)(A), the child must be repatriated.

17. The respondent parent opposing the return of the child has the burden of establishing "by clear and convincing evidence that one of the exceptions set forth in article 13b or 20 of the Convention applies." 42 U.S.C. § 11603(e)(2)(A).

18. However, even if the absconding parents meets that very high burden, the court still retains wide discretion to order the child's return to the non-absconding parent in the home country , even where such a defense has been accredited. Blondin II at 246 n.4.

**Jurisdiction**

19. This Court has jurisdiction pursuant to 42 U.S.C. § 11603 (1995)[13] and because this case involves the removal and retention of six children under the age of sixteen from their habitual residence of Guatemala to the United States of America.

**Status of Petitioner and Children**

20. Petitioner Aaron Teller ("Mr. Teller") is the father of the Children.

21. Respondent Sara Feiga Helbrans ("Mrs. Helbrans") is the mother of the children.

22. Petitioner's children are from oldest to youngest: his daughter **Yante Chane Teller** 14; son **Chaim Teller**, 12; daughter **Yite Sirtze Teller (Sirtze),** 11; daughter **Frimet Teller,** 9; son **Duvid Teller**, 7; and his daughter **Reyzel Teller**, 5. See Exhibit C, The Children's Birth Certificates.

23. At the time of Mrs. Helbrans' wrongful removal of the six Teller children, Mr. Teller was actually exercising custody rights within the meaning of Articles Three and Five of the

---

[13] This Court must apply the substantive law of the Convention. 42 U.S.C. § 11603(d) (1995).

Convention. [14] Mr. Teller is the father of the six children, had always lived with them and exercised his custody rights since they were born.

24. The parents were married fourteen years ago on March 29, 2005 in Canada where they lived until or about April 2014 and enjoyed shared joint custody of their six children under Canadian law.

25. On or about April 2014 the parents moved with their six children from Canada to Guatemala where they shared joint custody under Guatemalan law for the last five years.

26. Before Mrs. Helbrans' abduction of the six children between October 12 and November 8, 2018 neither Mrs. Helbrans nor her husband had ever been party to any family court or divorce proceeding regarding their marriage anywhere in the world.

27. The children have never lived in the United States and have no jurisdictional nexus to the U.S.

28. The children are dual Canadian citizens (by birth) and American citizenship (by derivative citizenship) and have U.S. passports.

29. The children and parents are currently also legal residents of Guatemala. See Exhibit D, Mr. Teller's and the Children's Guatemalan Temporary Residency documents attached herein.

30. The six children applied for Guatemalan temporary residency on July 4, 2016 and received it on June 27, 2017.

31. All of the children are under sixteen years old and thus are protected by the Hague Convention.

32. The children are fluent in Yiddish, their primary language. They were taught Yiddish at home and at the local religious schools run by their religious community. The older three children,

---

[14] The issue of "custody" must be addressed under Scots law. See Whallon v. Lynn, 230 F.3d 450 (1st Cir. 2000); Friedrich v. Friedrich, 983 F.2d at 1402.; see also Ohlander v. Larson, 114 F.3d 1531, 1541 (10th Cir. 1997) (stating that the Convention was meant, in part, to lend priority to the custody determination hailing from the child's state of habitual residence. Pursuant to Article 14 of the Convention, this Court "may take notice directly of the law of . . . The State of the habitual residence of the child, without recourse to the specific procedures for the proof of that law. . . ." See also Fed. R. Evid. 44.1.

Yante, Chaim and Sirtze have a basic knowledge of Spanish and the younger ones, Frimet, Duvid and Reyzel speak a little Spanish.

33. All six children generally speak almost no English and use translators to understand English.

34. The family belongs to the Lev Tahor community, an ultra orthodox Hasidic Jewish community but Mrs. Helbrans recently voluntarily left the community in Guatemala on October 12, 2018.

35. Mrs. Helbrans is the daughter of Lev Tahor's founder, Rabbi Shlomo Helbrans who founded this religious community in the 1980's in Israel.

36. In October 2018, Mrs. Helbrans abruptly decided to leave her life in Guatemala and the Lev Tahor community and practice a different form of Judaism in the United States.

37. Mrs. Helbrans disappeared with the children to New York: she first kidnapped Reyzel, Sirtze, and Frimet on October 12th and 13th, 2018 then transported another three children, Yante, Chaim and Duvid on November 5th, 2018 - thus creating this international custody dispute.

38. As explained fully below, Mrs. Helbrans applied to no Guatemalan Court for custody and used self-help, deceit and, unfortunately even violence to abduct the children starting in October 2018.

39. Mrs. Helbrans illegally manipulated the Guatemalan and American legal system by filing false amber alerts in both countries to first strip the father of physical custody and later take physical and legal temporary custody in NY of the six children.

40. Between October 12 and November 11, 2018 during two separate trips, Mrs. Helbrans illegally and forcibly transported the children to the U.S. without the father's permission.

41. As explained below, Mrs. Helbrans first engaged in parental kidnapping then engaged in an orchestrated plan of deceit, which allowed her to immediately get sole temporary custody of the six children from the New York City Family Court in Brooklyn almost upon arrival.

7

42. Mrs. Helbrans was granted sole temporary custody from a U.S. court with in one week - despite the fact that the children never lived in the U.S. and without the U.S. having jurisdiction over the custody of these six children.

43. The six children are currently temporarily living with the mother Mrs. Helbrans in Brooklyn since November 14, 2018.

### The Lev Tahor Religious Community

44. Until October 12, 2018 all six children were living with the parents in the Lev Tahor religious community in Guatemala since 2014.

45. Lev Tahor is based in Guatemala and is comprised of about 400 families, living in several parts of the world.

46. Lev Tahor is known for having a very conservative and strict religious doctrine and practice.

47. Because of its highly orthodox and ultra-literalist interpretation of doctrine and practice, Lev Tahor's critics claim that the religious community is a "cult, " and Lev Tahor's teachings are unpopular with mainstream Jewish culture and political views.

48. Lev Tahor members also state that they have been unfairly accused by critics who pressured Lev Tahor host countries, such as Guatemala to launch an aggressive child welfare investigation of Lev Tahor families.

49. This investigation yielded no evidence of neglect or abuse in Guatemala in 2017[15]. See Exhibit E, 2017 PDH Report (Spanish and English) Guatemalan Human Rights Prosecutor for Children

---

[15] In 2017 after a complaint by extended family members of Lev Tahor residents, the Guatemalan government engaged an all-agency investigation deploying no less than seven separate agencies to the community. The agencies came up with nothing- no children were removed or parents faulted. Petitioner has a video interview of the chief Guatemalan medical investigator for the PAN, the Guatemalan Child Protective Agency where he states conclusively that they found no evidence of child abuse and that the children all appeared healthy and well. This was notwithstanding intensive investigations by the PTH (the Guatemalan Human Rights Agency), the MP (the Prosecutor General), the Guatemalan local police, the Guatemalan National police, the DEIC (the Guatemalan Office of the Inspector General) all of which descended on the small community.

and Youth[16] Gloria Patricia Castro Gutierrez stating that the children "were in good physical condition with no signs of physical abuse…" and that "no evidence related to the abuses accused in the investigation was found according to what was observed and established by the institutions in charge of the raids, which were concluded at 8:10 A.M".

50. These investigations generated wide negative press coverage and paint an unfavorable but inaccurate picture of the community.

**51.**     **First Abduction of Frimet and Reyzel by Mrs. Helbrans<br>Starting on October 12, 2018**

52. Before dawn at 5 AM on Friday October 12, 2018, Mrs. Helbrans surreptitiously disappeared with her two children, Frimet and Reyzel, from the family home in Guatemala and took them to another town about 62 miles away in Guatemala.

53. She took the U.S. Passports of all her six children from the family home.

54. She did not notify Mr. Teller or any one in her family or community.

55. Hours later, a taxi driver known to the couple called Mr. Teller to falsely say that Mrs. Helbrans had gone to the hospital.

56. In fact, Mrs. Helbrans took Frimet and Reyzel to "Kehal Yerayim,"[17] a small new Hasidic Jewish community located in Guatemala City, in Zone 2.

---

[16] The investigators dispatched included prosecutors from the Public Prosecutor's Office, agents of the Directorate of Criminal Investigations (DICRI), a psychologist, a social worker, a translator, all led by the Public Prosecutor's Office and one or two representatives of the Human Rights Ombudsman's Office. 2017 PDH Report, English translation at 2.

[17] Kehal Yerayim consists of formerly Lev Tahor residents who were evicted by Aaron Teller and other leaders in 2016 because of illegal narcotics use and drug dealing as well the possession of pornography - obviously strictly forbidden. The residents were told to leave the community within 24 hours or the police would be notified of the drugs.  Most of the drug-consuming residents left as requested. Within this rift, Mrs. Helbrans - who speaks fluent Spanish - sided with the former members and they remained her friends in Guatemala until her departure in 2018. Mrs. Helbrans' brother Rabbi Nachman Helbrans is the chief rabbi of Lev Tahor and she opposed the eviction of the residents and sided against her brother.

57. Kehal Yerayim is comprised of two dozen families of former Lev Tahor members most of whom are recent converts of Central American backgrounds, such as Guatemalans, Salvadorians, and Hondurans.

58. On October 12, Mrs. Helbrans told her husband by telephone that she was leaving him immediately and taking the six children with her and permanently moving to the U.S.

59. Mr. Teller pleaded and begged her not to take the children away from him to the U.S. since the children had never lived in the U.S. and the parents had not lived there in decades.

60. Mr. Teller implored her to use the courts in Guatemala to file for divorce and custody of the children and have the courts decide.

61. He also suggested that if she did not wish to go through the Guatemalan Courts, she could file a case in the Rabbinical Court - all to no avail.

62. Mrs. Helbrans had the assistance of a local attorney who advised Mr. Teller that she was leaving him with the children to the U.S. and not applying to any Guatemalan Court.

63. On several occasions Mr. Teller attempted to persuade Mrs. Helbrans and her lawyer to resolve the custody issues in the local courts but Mrs. Helbrans adamantly refused and she said she was taking the other four children by force.

64. After the Sabbath at 3 AM on Saturday, October 13 while everyone was sleeping, Mrs. Helbrans entered the community with approximately 20 vigilantes.

65. Many of the vigilantes were from Kehal Yerayim, the dissident Hasidic community.

66. Some of these vigilantes were armed with machetes and sticks, one had a gun.

67. Using violence and beatings Mrs. Helbrans and these outside men tried to abduct the three children, Yante, Chaim, and Sirtze.

68. Mrs. Helbrans and the men came to Yante's home where she was living with her husband.

69. They proceeded to grab 14 year-old Yante and her 12 year old brother Chaim who violently resisted by kicking and screaming and refused to go with Mrs. Helbrans.

70. Hearing the noise of his children screaming for help, Mr. Teller ran to his daughter Yante's house next door and attempted to intervene.

71. Mrs. Helbrans attacked Mr. Teller and beat him. Another individual named Jimmy Lara from Kehal Yerayim hit him several times with a metal stick.

72. Mrs. Helbrans and the vigilantes also came to the home of Mrs. Riva Malka-Alter, a family friend and neighbor with whom Mr. Teller's ten year old daughter Sirtze was staying.

73. Mrs. Malka-Alter, is a witness to Mrs. Helbrans' kidnapping of Sirtze.

74. Mrs. Helbrans and the vigilantes fought with other community members who were trying to protect Sirtze from being abducted by Mrs. Helbrans in Mrs. Malka-Alters house.

75. Mrs. Sirtze and the other vigilantes succeeded in forcibly taking only the younger 10-year-old Sirtze after a violent struggle.

76. Mr. Teller called the police and reported the violent assault and the abduction but by the time the police arrived Mrs. Helbrans, Jimmy Lara and some of the vigilantes fled.

77. After their father's beating and Sirtze's kidnapping, the Yante and Chaim were terrified and adamantly wanted to immediately leave the area. Yante, Chaim and Mr. Teller believed they and their father were in danger if they stayed in the Lev Tahor community.

78. In the early hours of Monday October 22nd, Mr. Teller fled to Mexico with the children afraid for his life and for his children's safety and fearful that the mother would kidnap Yante, Chaim and Duvid.

79. Mr. Teller and the children left intending to return to their home in Guatemala after the danger passed.

80. Mr. Teller left word for Mrs. Helbrans and others in the community that he would be leaving with the children temporarily to prevent another abduction and that he would return when Mrs. Helbrans agreed to go to the Guatemalan family courts to decide the children's custody.

81. Mrs. Helbrans then made false reports to the Guatemalan police and to Child Protective Services that Mr. Teller had disappeared with the children and that the children were not safe with him.

82. Mrs. Helbrans filed Amber Alerts on the three children she had not yet kidnapped: Yante, Chaim and Duvid Teller. See Exhibit F, Guatemalan Amber Alerts on the three children.

83. The Amber Alerts falsely state the children disappeared October 4, 2018 when Mrs. Helbrans knew they were safe with their father the entire time.

84. On Monday October 22, the Guatemalan police and Child Protective Services responded aggressively due to a harassment campaign launched by Mrs. Helbrans where she claimed that the Lev Tahor community children were in danger.

85. The police began to raid the homes of all of community families on four separate days.

86. The police entered every single home of the community and investigated Mrs. Helbrans's' false allegations of child abuse in the community.

87. Finally after four different days of police raids yielded no evidence of any mistreatment or neglect of any children in the community, the police and the Child Protective Services took no further action.

88. No children were removed from any of their homes and Mrs. Helbrans' complaints that the community's children were in danger were determined to be unfounded by the investigators.

**Mr. Tellers Temporary Overland Trip to Mexico.**

89. On October 22 after arriving in Mexico Mr. Teller traveled to Tapachula, then to Mexico City then to Nuevo Laredo.

90. Mrs. Rivka Malka-Alter, who had earlier witnessed Sirtze's kidnapping in Guatemala arrived to assist Mr. Teller in taking care of the three children

91. On Tuesday November 6, 2018 Mrs. Helbrans kidnapped Frimet, Reyzel and Sirtze to the U.S.

92. Mr. Teller later learned that the children were now in New York.

93. On Thursday November 8 while still in Mexico, Mr. Teller went to the U.S. Consulate in Nuevo Laredo to apply for American passports for Yante, Chaim and Duvid so they could to return to Guatemala by plane since the mother had stolen their passports.

94. While at the consulate, American government officials separated Mr. Teller from his children and interviewed Mrs. Malka-Alter.

95. The consular officials spoke to Mrs. Helbrans who was in the New York by Skype who falsely stated that the children were in danger with Mr. Teller and reported an Amber Alert.

96. The consular officials took the three children from Mr. Teller.

97. Mr. Teller was detained for questioning that day.

98. Mr. Teller never charged with any crime or with any violation of law.

99. He was released to the Mexican authorities for immigration processing, which transported him to the American border at Laredo.

100.    That Friday at Laredo on the US side, FBI agents questioned Mr. Helbrans for nearly six hours and he was cleared and not changed with any crime since he had committed none.

101.    After his release, Mr. Teller hired a lawyer to look for the children but the lawyer could not find them anywhere.

102.    Mr. Teller learned that consular officials had placed his children in a facility in Mexico.

103.    That same weekend, several New York associates of the mother flew to Mexico to pick up the children and fly them to N.Y.

104.    On Sunday November 11, the children were released by U.S. consular officials[18] in Nuevo Laredo, Mexico to the mother's associates and flown to NY on a private flight financed by Mrs. Helbrans' associates.

105.    Learning that the children had been flown to NY, then Mr. Teller flew to NY to look for his six children.

106.    On Wednesday November 14th Mr. Teller  went to the offices of the NYC Administration for Children's Services (ACS) in Brooklyn to find the whereabouts of his six children.


**One Week Upon Abducting the Children to the US,  Mrs. Helbrans Illegally Obtained an Ex-Parte Custody Order in New York City Family Court**

107.    In New York on November 14, 2018, after illegally taking the six children to NY,  first three children on her own, then the other three children with the assistance of the US government, Mrs. Helbrans subsequently applied for an Ex Parte Emergency Custody Petition for all six children at the New York City Family Court, Kings County.

108.    The temporary custody order was improvidently later granted the same day.

---

[18] Until now neither Mr. Teller nor the children have ever been informed under what law or authority US government officials in Mexico seized his three children (ages 14, 12 and 6) who were Guatemalan residents on November 8, 2018 against their will and the father's, took them to a facility, handed them off to strangers who put them on a plane to fly to the U.S., a country the children never lived in.

14

109.    By happenstance, on that same day and time Mr. Teller went to the Offices of the

Administration for Children's Services in Brooklyn, NY to inquire about the whereabouts of his

children.

110.    After he waited an entire day, while the ex parte petition against him was being

simultaneously filed by ACS and signed by the Family Court Judge, Mr. Teller was served with

the custody petition and the executed order.

111.    Mr. Teller was not heard on that ex-parte petition since the petition falsely stated he was

unavailable, as explained below.

112.    Mr. Teller did not have counsel represent him since it was an ex parte order and received no

prior notice[19].

113.    As explained below, Mrs. Helbrans' custody petition was predicated on grave

misrepresentations of fact.

114.    First, Mrs. Helbrans falsely swore that the father was currently imprisoned in a Mexican

prison from crimes he had committed.

115.    Ms. Helbrans stated "the father is currently in jail in Mexico for violations of the Mexican

laws as well as for violating the amber alert from Guatemala".  See Exhibit G, Copy of Mrs.

Helbran's Petition and Custody Order, Kings County Family Court, NY.

116.    This was demonstrably false as he was not in a Mexican jail; he had not violated any

Mexican laws and had not violated any amber alert.

117.    Further, if Mr. Teller had he committed any crimes in Mexico, he would have been arrested

and charged with a crime and he never was.

---

[19] Mr. Teller later filed a pro see answer in opposition where he contested jurisdiction because of the abduction of his children.  That
request has either been denied or held in abeyance as the Family Court has not rescinded its temporary custody order.

15

118.    Indeed, Mr. Teller was in fact at the ACS offices in downtown Brooklyn at the same time the ex-parte petition was being argued by ACS and signed by the judge.

119.    Ironically on November 14, ACS officials personally handed the father the petition in the ACS office building at the very same time the petition falsely stated under penalties of perjury that he was imprisoned in Mexico.

120.     ACS officials therefore knew or should have known the Petition they had just proffered to the Court contained false but devastating information.

**The New York Family Court Order Should be Declared Invalid**
**Under the Hague Convention**

121.    For the following additional reasons, the Family Court Order should be invalidated under the Hague Convention.

122.    Clearly, the NY Family Court Order, based on an ex-parte application, filed within one week after arriving to the US, flies in the face of the letter and spirit of both The Hague Convention and ICARA and for those reasons alone it should be invalidated.

123.    The Family Court order should also be invalidated because of it was obtained through perjury and material misrepresentations of fact.

124.    Mrs. Helbrans premised the custody order on the fact that she had issued "Amber Alerts" for the children, presumably because Mr. Teller had absconded with the children or was attempting to do so.

125.    As demonstrated above, it was Mrs. Helbrans who absconded on October 12, and 13 when she first forcibly kidnaped the Reyzel, Frimet and Sirtze from their home in Guatemala.

126.    Although Mr. Teller unfortunately never filed for an Amber Alert after the abduction of his children to the U.S., he absolutely had the right to do so.

16

127.    Second, in the petition Mrs. Helbrans falsely claimed that she left Guatemala because she is afraid of the Lev Tahor community and its leadership.

128.    Mr. Helbrans does not mention that she was part of the leadership herself; she was the rebbetzen for Halacha[20] until she left.

129.    Mrs. Helbran's was an official leader of the community since she was the wife of Mr. Teller who is the "rabbinical dean" in the community. Her status as rebbetzen also derived from being the daughter of the community's founder, Rabbi Shlomo Helbrans, as well as the sister of the community's current rabbi, her brother Rabbi Nachman Helbrans.

130.    Third, Mrs. Helbrans claims she suffered emotional abuse from her husband and her former religious community Lev Tahor.

131.    However, in nineteen years of marriage, she filed no police reports against her husband or the community, filed no family court cases, sought no psychological, social worker, or domestic violence counseling -either secular or religious - from anyone either in Canada or Guatemala.

132.    Mrs. Helbrans also never complained to the Women's Auxiliary Committee of the Lev Tahor community of which she herself was a member. The Women's Auxiliary Committee[21] is comprised of women who mediate and address any of the women's concerns regarding family, community or marriage issues.

---

[20] Since the sexes are segregated publicly in Hasidic religious practice, the rabbi imparts the information to the women through his wife, thus the official position accorded the rabbi's wife, the rebbetzen. The women of the community referred to Mrs. Helbrans as Rebbetzen Teller. The rebbetzin for Halacha's duties are to communicate the Halacha Torah code of religious and moral conduct to the women of the community.

[21] Mrs. Helbrans became a part of this six-women Committee on about February 2015. She became the unofficial chair of this Committee on or about 2017 when she exercised the right to first open the meeting and coordinated the rules and times of the meetings.  They met weekly at about 11 AM to 1 PM. The topics of discussion were chosen by the women and dealt with issues such as teen issues, family issues, and the education of girls, modesty, and Halacha religious rules. Mrs. Helbrans was also often a featured speaker at the women's meetings on Sundays, which lasted about two hours, and she generally spoke about Halacha rules.

*133.*   The only complaint Mrs. Helbrans ever made regarding emotional abuse against either her husband or the community was made in her petition on November 14, in the Brooklyn Family Court *after she had illegally absconded to the U.S. with Mr. Teller's six children.*

134.   Lastly, the affidavit makes a grave false claim: that her religious community forced her to marry off her thirteen year old daughter Yante. Unfortunately for Mrs. Helbrans there is overwhelming evidence that it was *she who proposed and initiated the idea of having her daughter get married at thirteen.*

135.   Mrs. Helbrans wanted her to marry despite her age, because premarital relationships are taboo under Hasidic rules and Yante had fallen in love with a young man in the community and was insisting going to live with him.

136.   Indeed, the evidence shows Mrs. Helbrans personally planned, prepared, organized, and arranged her daughter's wedding.

137.   Mrs. Helbrans also personally paid the people who participated in the wedding arrangements. Please see Exhibit H, five detailed affidavits from Mrs. Helbrans' friends and associates.

138.   These witnesses explain that Ms. Helbrans herself conceived, planned, executed, participated in and indeed enjoyed her daughter's wedding party[22].

139.   If Mrs. Helbrans claims that she is afraid of the community that she helped lead for almost a decade, she needs to prove who forced her to conduct the wedding that she herself so much controlled, participated in and conducted for her daughter.

---

[22] Yante's wedding was the only one involving a minor that occurred in the Lev Tahor Guatemala community and it was done at Mrs. Helbrans insistence.

140.    For these reasons, no credence should be given to Mrs. Helbrans' claims in the ex-parte

petition regarding why she absconded with the children from Guatemala. Mrs. Helbran's claims

are demonstrably false at worst or highly suspect at best.

141.    Assuming arguendo that Mrs. Helbrans' claims were true, they could readily have been

addressed by the Guatemalan courts that maintain jurisdiction in this case.  Mrs. Helbrans is not

entitled to forum shop for the court most convenient to her by abducting the children to the US

and in one fell swoop cut off the fathers custody and visitation rights in a week.

142.    The Guatemalan legal system is equipped to handle such custody and abuse claims, as

evidenced by the swift and aggressive response when the Guatemalan police and Child

Protected Services entered the community in October 22, 2018 in response to Mrs. Helbrans'

false allegations and then conducted raids during four days.

143.    Should Mrs. Helbrans raise a misguided defense in the Convention claiming that the

children face "a grave risk of harm" in Guatemala, nothing in the facts would support such a

conclusion, since the standard of danger for the children in the home country under the

Convention is extremely high.[23] Of course, there has been absolutely *no evidence* in Mrs.

Helbrans' custody petition that the Teller children faced abuse by their father or that the

Guatemalan agencies and government were either unwilling or incapable of protecting them. On

---

[23] See Souratgar: "Under Article 13(b), a grave risk of harm from repatriation arises in two situations: "(1) where returning the child means sending him to a zone of war, famine, or disease; or (2) in cases of serious abuse or neglect, or extraordinary emotional dependence, when the court in the country of habitual residence, for whatever reason, may be incapable or unwilling to give the child adequate protection." Blondin IV, 238 F.3d at 162 (quotation marks omitted). The potential harm to the child must be severe, and the "[t]he  level of risk and danger required to trigger this exception has consistently been held to be very high." Norden-Powers v. Beveridge, 125 F. Supp. 2d 634, 640 (E.D.N.Y. 2000) (citing cases). The grave risk involves not only the magnitude of the potential harm but also the probability that the harm will materialize. Van de Sande v. Van de Sande, 431 F.3d 567, 570 (7th Cir. 2005)… This "'grave risk' exception is to be interpreted narrowly, lest it swallow the rule." Simcox v. Simcox, 511 F.3d 594, 604 (6th Cir. 2007); Blondin II, 189 F.3d at 246 (warning that permissive invocation of the affirmative defenses "would lead to the collapse of the whole structure of the Convention by depriving it of the spirit of mutual confidence which is its inspiration" (quotation marks and citation omitted)). Souratgar at p. 11.

the contrary, as explained *infra*, the Guatemalan government has been extremely forceful in addressing any child abuse allegations, however false or unfounded they may have been.

### The Children Should Be Immediately Returned To Guatemala Because The Abduction From Their Father Is Doing Them Irreparable Emotional Harm

144.    As explained supra, by the unfortunate confluence of multiple illegal actions taken by Mrs. Helbrans, the children now find themselves illegally in the physical custody of the mother, despite the facade of  legitimacy of the NY Family Court custody order.

145.    There is also ample evidence that at least some of the children are undergoing enormous emotional and psychological trauma by the abduction and forced migration.

146.    On multiple occasions the older Children, Yante, Chaim, and Sirtze have repeatedly called for their return to Guatemala and to their father.

147.    On November 20, 2018 14-year old Yante escaped from the foster family she had been placed with in Monroe, NY in Orange County.

148.    Yante took a taxi to Brooklyn Family Court to file her own custody petition[24] requesting that she and her siblings be returned to Guatemala[25]. See Exhibit I, Yante Tellers' Custody Petition, Filed on November 20, 2018 NY City Family Court, Kings County.

149.    After she ran away and filed her petition, Yante was hospitalized in a mental ward for children and held under observation under suicide watch for two weeks.

150.    Yante had always been a healthy child. Yante had never suffered from emotional problems before; she had never seen a counselor or psychologist in her life until after her forcible

---

[24] Yante Teller's petition is pending and yet to be ruled on.

[25] The Convention also grants standing to children to be heard by the federal courts for abduction determinations in certain cases.

abduction from Guatemala in November 8, 2018. These emotional problems are clearly the result of her being taken from her father and being brought here against her will.

151.    After the runaway attempt, Yante persisted in her efforts to return to Guatemala.  In December 2018, after all of her protests and requests to be returned home were ignored, Yante and Chaim themselves requested from Yante's husband Jacob Rosner, her father in law, Mayer Rosner and her uncle Mrs. Helbrans brother, Nachman Helbrans to assist them to run away to Guatemala and using their help, ran away via Mexico.

152.    Yante's husband and father in law and her uncle were arrested by the FBI in December 2018 and charged with kidnapping for allegedly violating the custody order granting Mrs. Helbrans custody.  Yante's family members are currently awaiting trial and have yet been indicted.  See Exhibit J, Press Release from the United States Attorneys Office, SDNY. See also Exhibit K, the federal criminal complaint.

153.    Notably, nowhere in the criminal complaint is there any indicia of a forcible abduction or any indicia that Yante and Chaim were unwilling participants in the runaway trip to Mexico.

154.    Yante and Chaim were not forcibly abducted since they were trying to desperately return to Guatemala and to be with their father since they were forcibly brought to NY through Mrs. Helbrans' machinations on November 11, 2018 when they were taken from their father by the U.S. government.

155.    Clearly, the SDNY matter should not deter this Court from repatriating the children to Guatemala; nor does it change the legal imperative that the nation of Guatemala has jurisdiction to decide custody under the Hague Convention and ICARA and that that Guatemala is legally presumed to be able to protect these children.

156.   Mr. Teller as a father who suffered the illegal abduction of his six children comes to this Court seeking the justice that only this Court can give him under the Hague Convention and ICARA. Mr. Teller humbly implores the Court to make the judicious decision it is empowered and obligated to make without fear or favor.

157.   The Hague Convention contemplates precisely scenarios involving international abduction of children and establishes a clear mandate that jurisdiction lies in the place of "habitual residence."

158.   After the arrest of Yante's husband, father in law and uncle, Yante and Chaim were returned by U.S. government officials from Mexico to New York, and returned once again to the mother.

159.   Again Mr. Teller contests the propriety of the government's actions in once again bringing the children from Mexico to the United States, as the Teller children have been Guatemalan residents for almost five years, have never lived in the U.S. and jurisdiction over their custody lies solely in Guatemala per the Hague Convention, international law and all applicable federal and state laws.[26]

**The Hague Convention Mandates that the Children Be Returned to Guatemala Where The Teller Children Have Habitually Resided**

160.   The removal of petitioner's children from Guatemala is in violation of the Hague Convention and is a "wrongful removal" within the meaning of Article 3 of the Convention.

161.   Unless this Court takes immediate measures to bring Mrs. Helbrans and the children before the Court, irreparable harm will occur to the Teller children and to multiple father-child relationships.

---

[26] In this traumatic case, it has been not once but twice that the US government transported Mr. Teller's children to the U.S. – a country where they have never lived - against the children's strong wishes and his own.

162.    Unless a show cause order is issued, Mr. Teller will continue to have no contact with his six children and the children's' and father's psychological health and their relationship with each other will be irreparably destroyed.

163.    In <u>Ozaltin</u>. Ozaltin, the Second Circuit upheld an interim visitation order for the non-absconding petitioner father in a Hague international child abduction case. <u>See Ozaltin v. Ozaltin, No.;- 12-2371 (2d Cir. 2013) at 2</u>:   "We affirm the District Court's return order. The Father met his burden of showing that he retained custody rights under Turkish law, and that the Mother's removal of the children from Turkey interfered with his exercise of those rights. With regard to the visitation claim, we hold—contrary to the Fourth Circuit's decision in <u>Cantor v. Cohen</u>, 442 F.3d 196 (4th Cir. 2006)—that *42 U.S.C. § 11603(b) creates a federal right of action to enforce "access" rights protected under the Hague Convention* (italics added). "

164.    Mr. Teller has never acquiesced or consented to the removal of his children from Guatemala; on the contrary, he has vehemently opposed it.


**Provisional Remedies**[27]

165.    Mr. Teller requests that the Court issue forthwith a Show Cause Order and direct that the Order be served immediately on Mrs. Helbrans and that she be directed to appear with the child promptly before this Court.

166.    Mr. Teller requests for the well-being of his children that an immediate Order be issued giving Mr. Teller immediate access to his children, pending further hearing by this Court.

167.    Pending further hearing in this Court, it is requested that this Court issue an immediate Order prohibiting the removal of the children from the jurisdiction of this Court, take into safe-

---

[27] This Court "[I]n furtherance of the objectives of . . . the Convention . . . may take or cause to be taken measures under Federal or State law, as appropriate, to protect the well-being of the child involved or to prevent the further removal or concealment before the final disposition of the petition" <u>42 U.S.C. 11604 (1995).</u>

keeping the children's  travel documents, and set an expedited hearing on this Verified Petition For the Expedited Return Of The Children To Petitioner[28]

168.    Petitioner requests pending further hearing, an immediate Order reversing, vacating, and staying all orders concerning custody, visitation and orders of protection issued against Mr. Teller, consistent with his rights to custody and visitation under the Hague convention.


**Relief Requested**

**WHEREFORE**, Mr. Teller respectfully requests the following relief:

a)  an Order nunc pro tunc declaring that the sole jurisdiction to determine custody of the Teller children is in the Courts of Guatemala;

b)  an Order immediately granting Mr. Teller visitation with his children;

c)  an Order immediately reversing, vacating and staying all the NY Family Court custody and visitation and order of protection orders, pending the outcome of this petition;

d)  an Order directing that the name of the Teller children be entered into the (NCIC) missing person section listing the father Mr. Aaron Teller as the complainant;

e)  an Order directing a prompt return of the child to their habitual residence in Guatemala;

f)  an Order directing that the children, together with Mrs. Helbrans, be brought into this Court by any United States Marshall, federal officer or police officer;

g)  an Order prohibiting the removal of the child from the jurisdiction of this Court pending a final decision by this Court;

---

[28] Such a Petition may also be treated as an application for a Writ of Habeas Corpus itself. Zajaczkowski v. Zajaczkowska, 932 F. Supp. 128, 132 (D.Md. 1996) ("[T]he Court will treat the [Convention] petition as an application for a writ of habeas corpus . . . pursuant to 28 U.S.C.A. § 2243"); see also In re McCullough, 4 F. Supp. 2d 411 (1998).

h)  an Order directing Mrs. Helbrans to pay Mr. Teller legal costs and fees; and any such

further relief as justice and its cause may require.

## Notice of Hearing

169.    Pursuant to 42 U.S.C. § 11603, Mrs. Helbrans will be given notice of any hearing in

accordance with § 76-d and 77-i of the UCCJEA.[29]

## Attorneys Fees and Costs Including Transportation Expenses Pursuant to Convention Article 26 and U.S.C. 11607

170.    Mr. Teller has incurred substantial expenses as a result of the wrongful removal and

retention of the children by Mrs. Helbrans. Mr. Teller will submit a copy of all expenditures as

soon as practicable and possible and will amend these costs, from time to time, according to

proof and in light of further expenditure required because of this wrongful removal and

retention.

171.    Mr. Teller respectfully requests that this Court award all legal costs and fees incurred to date

as required by 42 U.S.C. 11607, reserving jurisdiction over further expenses.


## Declaration Pursuant to Uniform Child Custody Jurisdiction and Enforcement Act[30]

172.    The details regarding petitioner's children that are required to be provided under the

UCCJEA are as follows:

---

[29] The Convention itself does not specify any specific notice requirements. ICARA provides that notice be given in accordance with the applicable law governing notice in interstate child custody proceedings. 42 U.S.C. § 11603(c). In the United States, the Parental Kidnapping Prevention Act ("PKPA") and the Uniform Child Custody Jurisdiction and Enforcement Act ("UCCJEA") govern notice in interstate child custody proceedings. Klam v. Klam, 797 F. Supp. 202, 205 (E.D.N.Y. 1992). The UCCJEA and Part (e) of the PKPA provide that reasonable notice and opportunity to be heard must be given to all parties before a custody determination is made. The UCCJEA further provides that notice shall be given in a manner reasonably calculated to give actual notice. In New York, the relevant statute is found in this State's UCCJEA at § 76-d. The Notice section provides, in pertinent part, that " notice and an opportunity to be heard in accordance with the standards of § 75-g must be given to all persons entitled to notice under the laws of this state as in child custody proceedings between residents of this state, any parent whose parental rights have not been previously terminated, and any person having physical custody of the child." Id.. Furthermore, in cases where flight of a respondent is at issue, federal courts have allowed substituted service in any manner reasonably effective to give the respondent notice of the suit. Ingram v. Ingram, 463 So.2d 932, 936 (La.App. 1985).

[30] N.Y. Dom. Rel. Law § 76-h

173.    The present address of Respondent's Children is 273 Skillman Street, Brooklyn, NY 11205.

174.    At time of removal, the Teller children were living at the following address in Guatemala:

Villa Bovel Km. 94, Carretera El Salvador, El Amatilo, Santa Rosa, Oratorio, Guatemala.

175.    Mr. Teller has resided at the following address in Guatemala: Villa Bovel Km. 94, Carretera

El Salvador, El Amatilo, Santa Rosa, Oratorio, Guatemala.


Respectfully submitted

this 22nd day of May 2019.


/s/ S. Michael Musa-Obregon
S. Michael Musa-Obregon, Esq.
Musa-Obregon Law, PC

Attorneys for Petitioner Aaron Teller
55-21 69th Street
New York 11378
Phone: 718-803-1000
Fax: 866-788-8061
Email: molawfirm@gmail.com

## VERIFICATION

I, Aaron Teller, solemnly declare and affirm under the penalties of perjury and the laws of the

United States of America that the contents of the foregoing Petition are true to the best of my

knowledge, information and belief.

May 23, 2019

so/Aaron Teller/

Signed by /S. Michael Musa-Obregon, Esq./,
electronically as Attorney in Fact for Aaron Teller,
pursuant to the Power of Attorney granted by Aaron Teller