Approved: _____
SAM ADELSBERG / JAMIE BAGLIEBTER
Assistant United States Attorneys

Before:  THE HONORABLE PAUL E. DAVISON
         United States Magistrate Judge
         Southern District of New York

- - - - - - - - - - - - - - - - X
                                 :
UNITED STATES OF AMERICA         :    AMENDED COMPLAINT
                                 :
       - v. -                    :    Violation of
                                 :    18 U.S.C.
                                 :    §§ 1201 & 2
MAYER ROSNER,                    :
JACOB ROSNER, a/k/a "Chaim       :    COUNTY OF OFFENSE:
Rosner," and                     :    SULLIVAN COUNTY
NACHMAN HELBRANS,                :
                                 :    18mj10939
               Defendants.       :
                                 :
                                 X
- - - - - - - - - - - - - - - - 

SOUTHERN DISTRICT OF NEW YORK, ss.:

        JONATHAN LANE, being duly sworn, deposes and says that he is a Special Agent with the Federal Bureau of Investigation ("FBI"), and charges as follows:

COUNT ONE
(Kidnapping)

        1.    From on or about December 8, 2018 through on or about December 19, 2018, in the Southern District of New York and elsewhere, MAYER ROSNER, JACOB ROSNER, a/k/a "Chaim Rosner," and NACHMAN HELBRANS, the defendants, together with others known and unknown, unlawfully seized, confined, inveigled, decoyed, kidnaped, abducted and carried away and held for ransom and reward and otherwise, a person when the person was willfully transported in interstate and foreign commerce, and the defendants traveled in interstate or foreign commerce and used the mail or any means, facility, or instrumentality of interstate or foreign commerce in committing or in furtherance of the commission of the offense, to wit, MAYER ROSNER, JACOB ROSNER, and NACHMAN HELBRANS participated in a scheme to kidnap two victims in Woodridge, New York and unlawfully transported the victims to Mexico.

(Title 18, United States Code, Sections 1201(a)(1) and 2.)

The bases for my knowledge and for the foregoing charges are, in part, as follows:

2. I am a Special Agent with the Federal Bureau of Investigation ("FBI"). I have been a law enforcement officer for approximately 14 years, and a Special Agent at the FBI for approximately one year. I have been personally involved in the investigation of this matter. This affidavit is based upon my conversations with law enforcement agents, witnesses and others, as well as my examination of reports and records. Because this affidavit is being submitted for the limited purpose of establishing probable cause, it does not include all the facts that I have learned during the course of my investigation. Where the contents of documents and the actions, statements and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

## OVERVIEW

3. On or about December 8, 2018, two children, ages 12 and 14, (the "Victims") were kidnapped from a residence in the Village of Woodridge, Sullivan County, New York (the "Residence"), where they were staying with their mother (the "Mother"). Approximately six weeks earlier, the Mother had fled from an organization in Guatemala called Lev Tahor.

4. Based on my review of publicly available information, I have learned that Lev Tahor is a group comprised of ultra-Orthodox Jews mostly living in Guatemala. I have further reviewed news reports indicating that children in Lev Tahor are often subject to physical, sexual and emotional abuse.

5. I have learned from other investigators who have spoken with the Mother, that the Mother was previously a voluntary member of Lev Tahor and that her father was its founder and former leader. According to the Mother, the new leader of Lev Tahor is more extreme than her father had been, and, as a result, she fled from the group. The Mother indicated that it was not safe to keep her children there. Prior to her escape, the Mother spoke out against the growing extremism within Lev Tahor.

6. Other investigators have also spoken with another former member of Lev Tahor ("CC-1")[1] and briefed me on the information provided. CC-1 was a member of Lev Tahor for over nineteen years before leaving the organization approximately three months ago. CC-1 has stated that the current leaders of Lev Tahor include MAYER ROSNER and NACHMAN HELBRANS, the defendants. CC-1 also stated that NACHMAN HELBRANS is considered the Rabbi within Lev Tahor, and that JACOB ROSNER a/k/a "Chaim Rosner," the defendant, is the son of MAYER ROSNER and is considered within Lev Tahor to be the husband of the 14-year old Victim.

## THE KIDNAPPING

7. Based on my conversations with an Investigator with the Bureau of Criminal Investigation, New York State Police ("Investigator-1"), I have learned, in substance and in part, the following:

 a. Investigator-1 reviewed court documents from Kings County Family Court indicating that on or about November 14, 2018, sole custody of the Victims—one of whom is 14 years old ("Victim-1") and the other is 12 years old ("Victim-2")—had been awarded to the Mother. In addition, Investigator-1 reviewed an Ex Parte Order of Protection dated November 14, 2018 issued in Kings County Family Court directing that the Victims' biological father (the "Father") have no contact with the Victims. Finally, on or about December 13, 2018, Investigator-1 reviewed a video taken on or about November 14, 2018 showing the Father being served with the Order of Protection and the paperwork indicating that the Mother was granted full custody of the Victims.

 b. On or about December 8, 2018, Investigator-1 conducted an interview of the Mother, who reported that she and the Victims, as well as her other children, recently fled from Lev Tahor. The Mother further reported that two of her children, the Victims, were taken from the Residence in the early morning of December 8, 2018 and that they have been missing since.

 c. Investigator-1 has reviewed video surveillance footage captured by cameras affixed to the Residence and informed me that the footage demonstrates that on or about December 8, 2018, at approximately 2:56 a.m., the Victims left the

---

[1] CC-1 has been cooperative with the Government with respect to this case. The information he has provided has been corroborated and proven reliable. CC-1 has no criminal history.

3

Residence, walked a short distance, and then entered into an unknown vehicle, which was stopped on the shoulder of the road.

       8. Based on my discussions with another investigator with the Bureau of Criminal Investigation, New York State Police ("Investigator-2") and an agent at the Federal Bureau of Investigation ("Agent-1") who have conducted interviews with CC-1, I have learned, in substance and in part, the following:

       a. CC-1 was formerly a member of Lev Tahor and left the organization in or about October 2018 and moved from Guatemala to New York.

       b. CC-1 and others were involved in a scheme to kidnap the Victims from the Residence and return them to the Lev Tahor organization.

       c. In connection with his participation in the kidnapping, CC-1 engaged in numerous conversations with others participating in the kidnapping, including MAYER ROSNER, and JACOB ROSNER a/k/a "Chaim Rosner," the defendants, as well as two other individuals, "CC-2" and "CC-3." CC-1 most frequently discussed the kidnapping plan with CC-2 and CC-3, in particular with CC-3.

       d. On or about December 4, 2018, CC-3 discussed the kidnapping with CC-1. During that conversation, CC-3 referred to "the Rabbi" in connection with the kidnapping.

       e. On or about December 5, 2018, CC-3 told CC-1 that, as part of the kidnapping plan, an individual called "Mishul" was going to come to New York and take the Victims. CC-1 stated that he further learned from CC-3 that the Victims were going to use Mishul's children's passports.

       f. On or about December 6, 2018, CC-1 was in a car in Brooklyn, New York with JACOB ROSNER and CC-3. At that time, JACOB ROSNER and CC-3 used the names Rabbi, "Mishul" and Nachman interchangeably, which led him to believe that "Mishul" was NACHMAN HELBRANS.

       g. CC-1 also stated that it was well-known in the Lev Tahor community, of which MEYER ROSNER, JACOB ROSNER, and NACHMAN HELBRANS were a part, that the Victims were taken by the Mother out of Guatemala. Additionally, CC-1 indicated that leaders of Lev Tahor including HELBRANS and MAYER ROSNER are aware of and often involved in every significant decision that concerns the community.

4

h. Prior to the kidnapping, CC-1 was informed by CC-3 that the plan was for the kidnapping to take place on December 7, 2018 at the Residence. CC-3 explained that CC-2 had been invited to a Hanukkah party at the Residence that evening and would spend the night at the Residence. CC-1 was informed that the plan was to get the Victims outside late at night, where JACOB ROSNER would be waiting for them on the street. JACOB ROSNER would then take the Victims in a car service to an airport. CC-1 stated that, although this was the plan, the kidnapping was not ultimately executed in this manner.

i. CC-1 stated that on or about December 5, 2018, CC-2, CC-3 and JACOB ROSNER drove to a retail store ("Retailer-1") with the purpose of purchasing clothing that the Victims could wear during the kidnapping that are inconsistent with clothing typically worn by ultra-Orthodox Jews. CC-1 was asked to join this trip to Retailer-1 but declined. Following the trip to Retailer-1, JACOB ROSNER, sent CC-1 photographs of himself at Retailer-1.

j. Prior to December 6, 2018, CC-1 met with CC-2 in Brooklyn, New York, and CC-2 provided him with what he represented to be a gift for Victim-1. According to CC-1, he inspected the package and found that it contained honey, a canister of coffee, and a telephone. CC-1 delivered the entire package, including the telephone, to Victim-1 without telling the Mother. JACOB ROSNER was with CC-1 when he made this delivery and was aware that the package included a telephone for Victim-1.

k. CC-1 reported that on several occasions, while he was meeting with CC-3 to discuss the kidnapping, CC-3 would call MAYER ROSNER to consult with him about the plan for the kidnapping. In particular, CC-1 recalls meeting with both CC-2 and CC-3 on December 6, 2018 to discuss the plan for the kidnapping, and recalls CC-3 consulting with MAYER ROSNER by phone during this meeting.

l. CC-1 also reported that on several occasions, while he was meeting CC-3 to discuss the kidnapping, CC-3 would also speak on the telephone with another individual who CC-3 referred to as "Mishul" during those conversations.

m. After the kidnapping, on or about December 14, 2018, CC-1 was visited at his apartment by another person he believed to be involved in the kidnapping ("Individual-1"), who is a brother of MAYER ROSNER and the uncle of JACOB ROSNER.

5

Individual-1 told him that he had heard that law enforcement was trying to speak with CC-1. Individual-1 then told CC-1 that if he talks to law enforcement, he must lie because if he tells the truth, he will be arrested for kidnapping and go to jail for 25 years. Individual-1 further said that, on the other hand, if CC-1 lies, he will only go to jail for three years for perjury.

    n. On or about December 16, 2018, CC-1 was approached again by Individual-1. Individual-1 drove CC-1 to a cellphone retailer in Manhattan, New York (the "Cellphone Retailer") and provided CC-1 with a cellphone ("CC-1's Phone").

    o. At that time, Individual-1 wrote down phone numbers for himself, MAYER ROSNER and another individual. Individual-1 also told CC-1 that several people, including MAYER ROSNER, wanted to speak with him.

    p. The phone number provided for MAYER ROSNER was a phone number ending in 5064 (the "5064 Phone").

    q. CC-1 later contacted MAYER ROSNER on the 5064 Phone. I have reviewed a transcript of the conversation between CC-1 and MAYER ROSNER, and have learned, in substance and in part, the following:

        i. MAYER ROSNER told CC-1 that CC-1 should buy a plane ticket to fly to Mexico so that MAYER ROSNER and CC-1 could "talk face to face."

        ii. MAYER ROSNER told CC-1 that he may be able to help him fund the purchase of a plane ticket to Mexico.

        iii. MAYER ROSNER asked CC-1 whether the Mother had an apartment, how she was paying for it, and who was helping her financially.

        iv. CC-1 believed, based on their conversation, that MAYER ROSNER wanted to speak with him and wanted him to come to Mexico because MAYER ROSNER wanted to ensure that CC-1 did not discuss the kidnapping with law enforcement and that CC-1 would continue to help MAYER ROSNER and the others in Lev Tahor, including with a potential kidnapping of another one of the Mother's children.

    9. Based on my review of records from a retailer in Brooklyn, New York ("Retailer-2") and the service provider for the 5064 Phone, I have learned, in substance and in part, that the

6

5064 Phone was purchased on or about December 4, 2018 and activated on or about December 5, 2018. I have further learned that the 5064 Phone was purchased by CC-2 and was purchased at the same time as another cellular phone with a number ending in 3766 (the "3766 Phone").

    10.  Based on my review of location information and the results of a search warrant for the 3766 Phone, I have learned, in substance and in part the following:

    a.  The location information indicated that the cellphone was in Brooklyn, New York and Woodridge, New York on or about December 7, 2018, and in New Jersey on or about December 8, 2018. Further, the 3766 Phone, in the days following the disappearance of the Victims, traveled south from New Jersey through North Carolina, Alabama, and Texas (among other states) before crossing into Mexico. The phone then traveled through Mexico and as of approximately 1 p.m. on or about December 15, 2018, the 3766 Phone has been located near the Mexican border with Guatemala.

    b.  The 3766 Phone has also been used to search for various locations in New York, New Jersey, Alabama and Texas including hotels, rental car providers and airports. The 3766 Phone was also used to search for directions to an address on the same block as the location from which the Victims were kidnapped within an hour of the kidnapping.

    11.  Based on my discussions with Investigator-2, who reviewed rental records from a rental car company (the "Rental Car Company") in Brooklyn, New York, I have learned, in substance and in part, that the Rental Car Company rented a gray Nissan Rogue to CC-2 from December 5, 2018 through December 9, 2018. Investigator-2 then spoke with a representative of the Rental Car Company and learned, in substance and in part, that a tag with a bar code was found in the rented Nissan Rogue. The writing on the tag indicated that it was connected to a purchase at Retailer-1.

    12.  I have learned from Investigator-1 that he has reviewed a purchase receipt and surveillance footage from Retailer-1, located in Secaucus, New Jersey on or about December 6, 2018. The records reveal that the tag located in the rented Nissan Rogue matches a jacket that was purchased along with other items of clothing at Retailer-1. The surveillance footage reveals that two individuals made this purchase.

7

13. I have further learned from Investigator-1, that on or about December 17, 2018, Investigator-1 showed CC-1 the surveillance footage from Retailer-1. CC-1 identified the two individuals in the store as JACOB ROSNER, a/k/a "Chaim Rosner," the defendant, and CC-3.

14. On or about December 17, 2018, I reviewed surveillance footage from an airport outside Scranton, Pennsylvania (the "Airport Footage"). The Airport Footage captured a man, a young girl, and a young boy going through airport security.

15. On or about December 19, 2018, I spoke to Agent-1 who spoke to CC-1 that same day and showed him the Airport Footage of the man, the young girl, and the young boy. CC-1 indicated that the Airport Footage depicted the Victims along with NACHMAN HELBRANS, the defendant.

16. Also on or about December 18, 2018, I reviewed the Airport Footage. In the footage, the boy is wearing a "Superman" hat while the man, identified by CC-1 as NACHMAN HELBRANS, the defendant, is wearing what appears to be a yellow winter hat. Both of these items were listed on the receipt provided by Retailer-1, *see* supra para. 13. As described above, these were among the items purchased by JACOB ROSNER, a/k/a "Chaim Rosner," the defendant, and CC-3 on or about December 6, 2018. I know from my experience and discussions with CC-1 that individuals in Lev Tahor are generally not permitted to wear the type of clothing that was purchased at Retailer-1 or that was depicted in the AIPORT FOOTAGE.

17. On or about December 18, 2018, Mexican law enforcement detained a number of individuals located in a residence outside Mexico City, where they suspected the Victims were located. NACHMAN HELBRANS, MAYER ROSNER and JACOB ROSNER, a/k/a "Chaim Rosner," the defendants, were among those detained. Mexican law enforcement also recovered MAYER ROSNER's and JACOB ROSNER's U.S. passports in the residence.

8

WHEREFORE, deponent respectfully requests that MAYER ROSNER and JACOB ROSNER, a/k/a "Chaim Rosner," and NACHMAN HELBRANS, the defendants, be arrested and imprisoned or bailed, as the case may be.

_____
JONATHAN LANE
Special Agent
Federal Bureau of Investigation

Sworn to before me this
27th day of December, 2018

_____
THE HONORABLE PAUL E. DAVISON
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK